UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                     :

MIRIAM A. GRAHAM,

                          :

            Plaintiff,

                          :

       -against-                                <u>OPINION AND ORDER</u>

                          :

                                      17 Civ. 7201 (GWG)

NANCY A. BERRYHILL,           :
Commissioner of the
Social Security Administration         :

            Defendant.          :
-----------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

Plaintiff Miriam R. Graham ("Graham") brings this action pursuant to 42 U.S.C.

§§ 405(g) and 1383(c) to obtain judicial review of the final decision of the Commissioner of

Social Security denying her claim for disability insurance benefits under the Social Security Act

(the "Act"). Both Graham and the Commissioner have moved for judgment on the pleadings

pursuant to Fed. R. Civ. P. 12(c).[1] For the reasons stated below, the Commissioner's motion is

granted and Graham's motion is denied.

I.  <u>FACTUAL BACKGROUND</u>

    A.  <u>Procedural History</u>

On October 7, 2014, Graham filed a claim for social security disability benefits with an

alleged disability onset date of February 1, 2013. Administrative Record, filed May 29, 2018

---

[1] <u>See</u> Notice of Motion for Judgment on the Pleadings, filed Aug. 28, 2018 (Docket # 14)
("Pl. Not."); Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment
(annexed to Pl. Not.) ("Pl. Mem."); Notice of Motion, filed Oct. 30, 2018 (Docket # 22);
Memorandum of Law in Support of Defendant's Motion for Judgment on the Pleadings and in
Opposition to Plaintiff's Motion for Judgment on the Pleadings, filed Oct. 30, 2018 (Docket
# 23) ("Def. Mem.").

(Docket # 10), and Supplemental Administrative Record, filed Oct. 18, 2018 (Docket # 21)

("R"), 179-82.  She filed an application for Supplemental Security Income ("SSI") on October

14, 2014, with the same alleged disability onset date of February 1, 2013.  R. 183-91.  Both

claims were denied on January 22, 2015, R. 96-97, and Graham was notified of the denial on

January 23, 2015, R. 98-113.  On March 3, 2015, Graham requested a hearing before an

administrative law judge ("ALJ").  R. 114-18.  The hearing took place on September 29, 2016.

R. 48-73.  Graham, who appeared with a representative,[2] testified at the hearing, along with

vocational expert ("VE") "Mr. Green."[3]  R. 48-50.  On February 8, 2017, the ALJ denied

Graham's claim in a written decision.  R. 8-29.  On April 10, 2017, Graham, by her attorneys,

requested review of the ALJ's decision by the Appeals Council.  R. 247-50.  On July 24, 2017,

the Appeals Council denied the request for review.  R. 1-7.  On September 21, 2017, Graham

filed the instant action.

B.  The Administrative Record

Graham and the Commissioner have each provided a summary of the medical evidence

contained in the administrative record.  See Pl. Mem. at 3-5; Def. Mem. at 2-7, 10-22.  The

Court accepts as accurate the summaries to the extent that they are consistent with each other.

The Commissioner objects to Graham's characterization of several aspects of the record.  See

Def. Mem. at 2-7.  We address only those objections that are relevant to the instant motion.

First, with respect to the electromyograph ("EMG") performed on October 1, 2014, see

Pl. Mem. at 4; Def. Mem. at 3; R. 448, the Commissioner is correct that Graham's

---

[2]  While the ALJ's decision states that the representative is not an attorney, see R. 11, during the hearing, the ALJ identified her as an attorney, R. 50.

[3]  Mr. Green's first name is not in the record.

characterization of the test is incomplete. The record shows that the attending physician found that the EMG showed "evidence of a very mild right median nerve entrapment at the wrist, which was detected only with ancillary studies," and that there was "no evidence of right cervical radiculopathy." R. 448. The Commissioner's summary also accurately states the additional evidence contained in this report. See Def. Mem. at 3.

Next, we find that the Commissioner's summary of Dr. Browne's opinion is more complete than Graham's summary, see Pl. Mem. at 4; Def. Mem. at 4-5, and accurately summarizes Dr. Browne's opinion, see Def. Mem. at 4-5, 15, 18, 21. Similarly, the Commissioner's summary of the Dr. Sharon Revan's January 2015 report is more complete than Graham's summary. See Pl. Mem. at 4-5; Def. Mem. at 5-7. The Court therefore adopts the Commissioner's summaries of these portions of the record, see Def. Mem. at 5-7, though we of course consider and cite to the original records, not the parties' summaries.

C. Hearing Before the ALJ

At a hearing held on September 29, 2016, Graham testified that she was born on April 16, 1966, and lives with her husband. R. 52, 62. Graham is five feet five inches tall and weighs 175 pounds. R. 52. She has a G.E.D. and obtained a medical assistant certificate through a program administered by the Human Resources Administration. R. 53.[4] Prior to the alleged onset of her disability, Graham worked primarily as a nursing assistant, and also as a babysitter. R. 54-57, 65-66. Immediately prior to the alleged date of disability onset, Graham worked as a nursing assistant "[m]aybe for a month." R. 54. In that position, she performed personal care

---

[4] During the hearing, Graham stated that a job she applied for with her certificate informed her that the certificate was "no good," and she stated that the course she took "was bogus." R. 53.

activities for patients such as bathing, feeding, turning, and positioning them.  R. 55.  She left

that position after her "feet became severely swollen" and her back "gave out" on her.  R. 55.

Graham testified that she worked as a certified nursing assistant ("CNA") at St. Vincent DePaul

from 2001 to 2011.  R. 55.  In that position, she was required to lift or carry up to 75 pounds.

R. 55.  She left that job because she broke her toe and was suffering from back problems.  R. 56.

Graham testified that self-employment earnings from 2011 and 2013 were from babysitting.

R. 56.  She babysat for a child who was about three years old.  R. 56.  As a babysitter, Graham

testified that she "didn't have to lift or carry anything," that she could "sit most of the time," and

that "[t]he only time that [she] would have to stand is when [she] would have to get the baby . . .

snacks or food."  R. 66.

Graham testified that she could no longer work because of "[w]eakness of [her] right

side," and tremors in her right hand, as well as carpal tunnel syndrome.  R. 57-58.  She stated

that both the tremors and the carpal tunnel syndrome started in 2014, shortly after she was

diagnosed with pulmonary embolism and deep venous thrombosis.  See R. 57-58; see

also R. 256-325 (hospital records documenting 2014 diagnosis of pulmonary embolism).

Graham testified that because of the tremors, she could not "hold anything in [her] right hand,"

and "can't even . . . open . . . a bottle of water with [her] right hand."  R. 57.  Graham denied

having any surgery or procedures performed to address her carpal tunnel syndrome.  R. 58.

In addition, Graham testified that she "suffer[s] from severe migraine[s] and vertigo"

and gets "really bad dizzy spells."  R. 61.  She testified that light makes her headaches worse,

and that when her headaches are bad her husband has to cover the windows with sheets to keep

the light from bothering her.  See R. 61.  She testified that her migraines can last for two to three

days in a row, and that medication she takes sometimes "gives [her] a little bit of relief but

4

. . . doesn't help."  R. 61.  On a scale of one to ten, with ten being the worst, Graham stated that her headaches were a "[t]wenty."  R. 61.

Graham also testified that she has asthma, and that she suffers from anxiety.  R 62-63.  She stated that she can "walk two to three blocks slowly without needing [her] pump for [her] asthma."  R. 61-62.  She did not have a nebulizer machine but stated that her doctor was going to prescribe her one soon.  R. 63.  Graham stated that she had experienced recent asthma attacks, but had not gone to the hospital because she was able to treat them with her "pumps" and by slowing her breathing.  R. 62-63.  She testified that slowing her breathing also helped her manage her anxiety.  See R. 63.

Graham testified about the doctors that she sees for her medical conditions.  See R. 58-60.  She stated that she sees her primary care physician, Dr. Browne, once or twice per month, and sees two neurologists,[5] a respiratory doctor, and a hematologist.  R. 58-60.  She testified that she recently completed physical therapy for pelvic pain, and that while she received physical therapy for back pain, she could not complete it because her "pelvic pain was getting in the way."  R. 63.  She testified that she had injections for her back pain "[a] long time ago."  R. 64.  She stated that her medications cause side effects, which made it difficult to sleep and caused nausea.  R. 64.

Graham also testified about the limitations her medical conditions cause.  She stated that her husband takes care of all of their household chores and duties, except for vacuuming which she can do "because it only takes one hand to push the vacuum."  R. 60.  Her daughters also

---

[5] The hearing transcript states that Graham sees a "second urologist, Dr. Getlavich," but this is apparently a typographical error, as Graham did not mention seeing a first urologist, and the record indicates elsewhere that Dr. Gitlevich is a neurologist.  See, e.g., R. 376.

assist with chores when they come to visit. R. 62. Graham testified that she can sit "for about four hours" at a time, but the total amount time depends because she has "painful . . . lesions on [her] bottom."[6] R. 60. She testified that she could stand for "two, three, maybe four hours depend[ing on] if [her] knee doesn't give out on [her]." R. 60. She testified that she has "fallen in the past because [her] knee, [her] right side just gave out on [her]." R. 60. Because of the danger of falling, Graham cannot take a shower if her husband is not home, R. 60, and requires his help showering, R. 61. She can, however, take baths by herself. R. 61. On a typical day, Graham testified that she "sit[s] home with [her] cat." R. 64. She stated that she travels to medical appointments by car with her husband. R. 64. On "good days," she can drive herself with her husband in the car, and he drives back. R. 64.

The ALJ also heard testimony from the VE. R. 50, 64-72. The ALJ posed several hypothetical examples to the VE. First, the ALJ asked the VE to:

> assume a person of the claimant's age, education and work experience is able to perform light work, right foot control operation frequent, never climb ladders, ropes or scaffolds, the climbing of ramps or stairs, balancing, stooping, crouching, kneeling and crawling occasional, right reaching, right overhead reaching, right handling objects that is gross manipulation, right fingering that is fine manipulation of items most as small as the size of a paperclip and right feeling frequent. Avoid concentrated exposure to extreme cold, extreme heat and to wetness or humidity. Avoid concentrated exposure to irritants such as fumes, odors, dust and gases.

R. 67. The VE testified that such a person would not be able to perform the CNA and nurses' aide positions that Graham performed, either as she performed them or as they are customarily

---

[6] The record reflects that Graham has hidradenitis suppurativa on her buttocks, see, e.g., R. 75, 86, 452, 455, which is skin condition that "causes small, painful lumps to form under the skin," which "can break open, or tunnels can form under the skin." See Hidradenitis suppurativa, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/hidradenitis--suppurativa/symptoms-causes/syc-20352306 (last visited Dec. 3, 2018). The condition mostly affects areas where the skin rubs together. See id.

performed. R. 67. While such an individual would not be able to perform the job of babysitter as it is generally performed, he or she would be able to perform it as Graham testified that she performed it. R. 67-68. In addition, such a person would be able to perform the following jobs that exist in the national economy: hand packager (approximately 220,000 positions); cashier (approximately 1,150,000 positions); and office helper (approximately 117,000 positions). R. 68.

Next, the ALJ asked the VE to "assume a person of the claimant's age, education and work experience who's able to perform light work with all the same limitations . . . included in the last example, [except] changing right reaching, right overhead reaching, right handling objects, right fingering and right feeling to occasional." R. 68. The VE testified that such a person would not be able to perform any work, because light work generally requires "dominant hand reaching and handling at the frequent level" and sedentary work generally requires "frequent use bilaterally for handling and reaching." R. 69.

The ALJ then asked the VE to "assume a person of the claimant's age, education and work experience, is able to perform sedentary work with all of the same limitations . . . included in the first hypothetical. In other words . . . frequent to . . . all of those manipulative limitations . . . ." R. 70. The VE testified that such an individual would not be able to perform the nurses' aid or CNA positions, nor babysitting as it is generally performed. R. 70. However, such a person could perform babysitting as Graham performed it, and could also perform the following jobs that exist in the national economy: circuit board tester (approximately 117,000 positions); order clerk (approximately 91,000 positions); charge account clerk (approximately 135,000 positions). R. 70.

The ALJ did not pose any additional hypotheticals, but did ask the VE to consider "how certain other limitations might affect other work." R. 70. The ALJ asked the VE to assume that

"due to a combination of medical conditions and associated pain this person is only able to engage in sustained work activity on a regular and continuing basis for four hours per day." R. 70.  The VE affirmed that in such a case, "all competitive work [would] be precluded."  R. 70. This was also the case for a hypothetical individual who "would be absent two days per month on a regular and continuing basis," and for an individual who "would be off task 15 percent of the work period in addition to regularly scheduled breaks."  R. 70-71.

D. The ALJ's Decision

The ALJ concluded that Graham was not disabled from the alleged onset date, February 1, 2013, through the date of his decision.  R. 26.  In his decision, the ALJ used the five-step sequential evaluation process described in the Social Security Regulations for determining whether an individual is disabled.  R. 13-26; see 20 C.F.R. §§ 404.1520(a); 416.920(a).  First, the ALJ found that Graham met the insured status requirements of the Act through December 31, 2016.  R. 13.  Next, he found that Graham had not engaged in substantial gainful activity since February 1, 2013, the alleged onset date of her disability.  R. 13.  The ALJ then found that Graham suffered from the following severe impairments: "migraines; asthma; deep venous thrombosis; history of pulmonary embolism; right carpal tunnel syndrome; cervical degenerative disk disease; [and] dystonic tremor."  R. 14.  The ALJ also noted that Graham "takes medication for gastroesophageal reflux disease (GERD)," but concluded that Graham's GERD was "not a severe impairment" because it "appears to be relatively well controlled and does not cause significant work-related functional limitations."  R. 14.  The ALJ noted that Graham "has complained of hidradenitis suppurativa, which she said caused lesions on her buttocks"  but concluded that "to the extent that hidradenitis suppurativa is a medically determinable impairment in this case, it is not severe" because Graham stated "that she could sit for

approximately four hours despite this condition," and "the record reveals minimal treatment or evaluation for such a problem." R. 14. After applying the "paragraph B" criteria contained in section 10.00C of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1), the ALJ concluded that Graham's "medically determinable impairment of anxiety state does not cause more than minimal limitation in [her] ability to perform basic mental work activities and is therefore nonsevere." R. 14. Next, the ALJ concluded that Graham did "not have an impairment or combination of impairments that me[t] or medically equal[ed] the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." R. 15-16. The ALJ noted that in making this determination, he considered "all of the impairments listed in Appendix 1, with particular attention to sections 1.04, 3.03, 4.11, 11.02, and 11.14." R. 16.

The ALJ next determined Graham's residual functional capacity. R. 17-24. In doing so, the ALJ discussed Graham's reported symptoms and summarized the evidence he relied upon in reaching his RFC determination. R. 17-18. The ALJ concluded that while Graham's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms . . . [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 18. The ALJ determined that Graham retained the following residual functional capacity ("RFC"):

> [Graham] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she can frequently operate foot controls with the right lower extremity. The claimant can occasionally climb ramps or stairs, but never climb ladders, ropes, or scaffolds. She can occasionally balance, stoop, crouch, kneel, and crawl. The claimant can frequently perform reaching in all directions, including overhead, with the right upper extremity. She can frequently handle, that is, perform gross manipulation, and finger, that is, perform fine manipulation of objects no smaller than a paperclip, with the right upper extremity. The claimant can frequently feel with the right upper extremity. She should avoid concentrated exposure to extreme cold, extreme heat, and wetness or humidity, as well as irritants such as fumes, odors, dust, or gases.

R. 17.

The ALJ found that Graham was capable of performing past relevant work as a babysitter as she actually performed the job.  R. 24-25.  The ALJ also found that Graham could perform other jobs existing in the national economy, including hand packager (approximately 220,000 positions), cashier (approximately 1,150,000 positions), and office helper (approximately 117,000 positions).  R. 25.  The ALJ based this conclusion upon testimony from the VE based on a hypothetical involving a person of Graham's age, education, work experience, and RFC.  See R. 25.  Accordingly, the ALJ concluded that Graham had not been under a disability from February 1, 2013, through the date of the decision.  R. 25.

II.  APPLICABLE LAW

A.  Scope of Judicial Review Under 42 U.S.C. §§ 405(g) and 1383(c)

A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citation and quotation marks omitted); accord Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008); see also 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); id. § 1383(c)(3) ("The final determination of the Commissioner of Social Security . . . shall be subject to judicial review as provided in section 405(g) . . . .").  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); accord Burgess, 537 F.3d at 127-28; Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).  The "threshold for such evidentiary

sufficiency is not high." Biestek v. Berrihill, 139 S. Ct. 1148, 1154 (2019).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citation and internal quotation marks omitted). Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)); accord McIntyre v. Colvin, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.") (citation omitted). The Second Circuit has characterized the "substantial evidence" standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447-48 (2d Cir. 2012) (per curiam) (citation omitted). "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. at 448 (emphasis in original) (citation and internal quotation marks omitted). "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision." Johnson, 563 F. Supp. 2d at 454 (citation and internal quotation marks omitted).

B. Standard Governing Evaluation of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); accord id. § 1382c(a)(3)(A). A person will be found to be disabled only if it is determined that his "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To evaluate a claim of disability, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

Regulations issued pursuant to the Act set forth a five-step process that the Commissioner must use in evaluating a disability claim. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Burgess, 537 F.3d at 120 (describing the five-step process). First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(I), 416.920(a)(4)(I). Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," 20 C.F.R. §§ 404.1520(c), 416.920(c). Third, if the claimant's impairment is severe and is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, or is equivalent to one of the listed impairments, the claimant must be found disabled regardless of his age, education, or work experience. See

20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d).  Fourth, if the claimant's impairment is not listed and is not equal to one of the listed impairments, the Commissioner must review the claimant's RFC to determine if the claimant is able to do work he or she has done in the past, i.e., "past relevant work."  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant is able to do such work, he or she is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's RFC, in addition to his or her age, education, and work experience, permits the claimant to do other work.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If the claimant cannot perform other work, he or she will be deemed disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The claimant bears the burden of proof on all steps except the final one — that is, proving that there is other work the claimant can perform.  See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

III.  DISCUSSION

Graham seeks reversal or remand of the ALJ's decision on the grounds that (1) the ALJ failed to properly follow the treating physician rule by failing to give controlling weight to the opinion of treating physician Dr. Desmond Browne, and by failing to fully adopt either the opinion of Dr. Browne or of consultative examiner Dr. Revan; and (2) the Appeals Council failed to consider new and material evidence submitted to it that relates to the period on or before the date of the ALJ's decision.  We address each argument in turn.

A.  Whether Proper Weight was Afforded to the Opinions of Dr. Browne and Dr. Revan

1.  The "Treating Physician" Rule

Under the so-called "treating physician" rule, in general, the ALJ must give "more weight to medical opinions" from a claimant's "treating source" — as defined in the regulations

— when determining if the claimant is disabled.  See 20 C.F.R. §§ 404.1527(c)(2),

416.927(c)(2).  Treating sources, which includes some professionals other than physicians, see

20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2), "may bring a unique perspective to the medical

evidence that cannot be obtained from the objective medical findings alone or from reports of

individual examinations, such as consultative examinations."  20 C.F.R. §§ 404.1527(c)(2),

416.927(c)(2).  The Second Circuit has summarized the deference that must be accorded the

opinion of a  "treating source" as follows:

> Social Security Administration regulations, as well as our precedent, mandate
> specific procedures that an ALJ must follow in determining the appropriate
> weight to assign a treating physician's opinion.  First, the ALJ must decide
> whether the opinion is entitled to controlling weight.  "[T]he opinion of a
> claimant's treating physician as to the nature and severity of [an] impairment is
> given 'controlling weight' so long as it 'is well-supported by medically
> acceptable clinical and laboratory diagnostic techniques and is not inconsistent
> with the other substantial evidence in [the] case record.'"  Burgess, 537 F.3d at
> 128 (third brackets in original) (quoting 20 C.F.R. § 404.1527(c)(2)).  Second, if
> the ALJ decides the opinion is not entitled to controlling weight, it must
> determine how much weight, if any, to give it.  In doing so, it must "explicitly
> consider" the following, nonexclusive "Burgess factors": "(1) the frequen[cy],
> length, nature, and extent of treatment; (2) the amount of medical evidence
> supporting the opinion; (3) the consistency of the opinion with the remaining
> medical evidence; and (4) whether the physician is a specialist."  Selian[, 708
> F.3d at 418] (citing Burgess, 537 F.3d at 129 (citing 20 C.F.R. § 404.1527(c)(2))).
> At both steps, the ALJ must "give good reasons in [its] notice of determination or
> decision for the weight [it gives the] treating source's [medical] opinion."
> Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (quoting 20
> C.F.R. § 404.1527(c)(2)). . . .  An ALJ's failure to "explicitly" apply the Burgess
> factors when assigning weight at step two is a procedural error.  Selian, 708 F.3d
> at 419-20.

Estrella v. Berryhill, 925 F.3d 90, 95-96 (2d Cir. 2019).  Accordingly, the Second Circuit has

stated that it will "not hesitate to remand when the Commissioner has not provided 'good

reasons' for the weight given to a treating physician[']s opinion and [it] will continue remanding

when [it] encounter[s] opinions from ALJ[s] that do not comprehensively set forth reasons for

the weight assigned to a treating physician's opinion." Halloran, 362 F.3d at 33; accord Estrella, 925 F.3d at 96; see also Greek, 802 F.3d at 375-77.

Nonetheless, the Commissioner is not required to give deference to a treating physician's opinion where the treating physician "issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran, 362 F.3d at 32 (citation omitted). In fact, "the less consistent [a treating physician's] opinion is with the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (citing 20 C.F.R. § 404.1527(d)(4)); see also Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.") (citation omitted). Finally, a "slavish recitation of each and every [factor listed in 20 C.F.R. § 404.1527(c)]" is unnecessary "where the ALJ's reasoning and adherence to the regulation are clear," Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) (citing Halloran, 362 F.3d at 31-32), and even where the ALJ fails to explicitly apply the "Burgess factors," a court may, after undertaking a "'searching review of the record,'" elect to affirm the decision if "'the substance of the treating physician rule was not traversed.'" Estrella, 925 F.3d at 96 (quoting Halloran, 362 F.3d at 32).

2. Analysis

Graham argues that the ALJ erred in according only "limited weight" to the opinion of treating physician Dr. Desmond Browne, because his opinion is "well supported by the medical evidence" and accordingly "deserved controlling weight." Pl. Mem. at 7. In particular, Graham argues that "Dr. Browne assessed a residual functional capacity for Ms. Graham that would . . . preclude even sedentary work," and argues that this opinion was "supported by the diagnostic evidence," as well as additional clinical evidence. Id. at 7-8. As already noted, for

the opinion of a treating physician to be given controlling weight, the opinion must be both "well-supported by medically acceptable clinical and laboratory diagnostic techniques <u>and</u> . . . <u>not inconsistent with the other substantial evidence</u>" in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (emphasis added). Here, the ALJ did not err in according only limited weight to Dr. Browne's opinion because it is contradicted by substantial evidence in the record, as described below.

Dr. Browne completed a Medical Source Statement in September 2016. <u>See</u> R. 466-75. In this statement, Dr. Browne opined that Graham could never carry or lift any amount due to her dystonic tremor, R. 466, but that she could carry small objects, R. 467. He opined that she could sit for four hours and stand for four hours without interruption, and do each for four hours total during an eight-hour work day, and that Graham could walk for 15 minutes uninterrupted and in total during an eight-hour work day. R. 467. Dr. Browne opined that Graham could only occasionally reach, handle, finger, or feel objects with her right hand, and could never push or pull with her right hand, though she could perform all these functions frequently with her left hand. R. 468. He opined that she could occasionally operate a foot control with her right foot, though she could do so continuously with her left foot. R. 468. He found that she could occasionally climb stairs and ramps, balance, stoop, kneel, and crouch, but never crawl or climb ladders or scaffolds. R. 469. Dr. Browne opined that Graham could never tolerate exposure to unprotected heights, humidity and wetness, dust, odors, fumes, and pulmonary irritants, extreme cold, extreme heat, or vibrations, though she could occasionally tolerate exposure to moving mechanical parts and could frequently operate a motor vehicle. R. 470. Dr. Browne indicated that Graham could perform activities like shopping, traveling without a companion, ambulating without using assistive devices, climbing a few steps at a reasonable pace with the use of a single

hand rail, preparing simple meals and feeding herself, caring for her own personal hygiene, and sorting, handling, and using paper files.  R. 471.  However, Dr. Browne stated that Graham could not walk at a reasonable pace on rough or uneven surfaces.  R. 471.

In according only limited weight to Dr. Browne's opinions, the ALJ reasoned that "the exertional and manipulative restrictions . . . [Dr. Browne] assessed are extreme and not supported by treatment records."  R. 24.  Indeed, the treatment records and other evidence in the record fail to support Dr. Browne's conclusions.  Although Dr. Browne checked boxes indicating Graham's limitations in the medical source statement, he left blank almost all the questions that sought "particular medical or clinical findings" to support his assessments.  See R. 466-71.  The ALJ was certainly correct that Dr. Browne's treatment records did not support the limitations claimed.  In fact, the record does not contain Dr. Browne's treatment records at all notwithstanding the fact that the SSA requested them twice.  See R. 78.

In fact, while there is evidence that Graham has experienced tremor in her right hand, as the ALJ recognized, R. 16, 19-20, medical evidence in the record supports a finding that Graham retains the ability to use her upper extremities, despite her tremor.  In August 2014, treating neurologist Dr. Tatyana Gitlevich observed a right, upper extremity resting tremor, but also noted that she did not observe a postural tremor[7] or dysmetria[8] upon a finger-nose-finger test.

---

[7]  "Postural tremor occurs when a person maintains a position against gravity, such as holding the arms outstretched."  Tremor Fact Sheet, Nat'l Institute of Neurological Disorders & Stroke, https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education-/Fact-Sheets-/Tremor-Fact-Sheet (last visited Dec. 5, 2018) ("Tremor Fact Sheet").

[8]  Dysmetria is "[a]n aspect of ataxia, in which the ability to control the distance, power, and speed of an act is impaired."  Stedman's Medical Dictionary 553 (27th ed. 2000).  It is "[u]sually used to describe abnormalities of movement caused by cerebellar disorders."  Id. Ataxia is "[a]n inability to coordinate muscle activity during voluntary movement."  Id. at 161.

R. 441.  In October 2014, Dr. Gitlevich observed normal strength in all extremities and noted

that while there was "some give in the [right] arm," Graham was able to achieve 5/5 in

"[s]trength."  R. 447.  She noted a "very mild low amplitude/high frequency endpoint tremor

bilaterally" upon finger-nose-finger examination, but no dysmetria.  R. 448.  Dr. Gitlevich noted

"another tremor in the [right] hand that is higher in amplitude," but also noted that it "stops upon

distraction."  R. 448.  Dr. Gitlevich noted that the tremor in both hands might be an "enhanced

physiologic tremor"[9] which might be "exacerbated by the daily use of albuterol."  R. 652, 665.

Dr. Gitlevich made similar observations in regard to the tremors and Graham's strength at visits

in January 2015 and May 2015.  See R. 649-52, 656-59.

Consultative examiner Dr. Sharon Revan observed Graham's hand and finger dexterity to

be intact, and found her to have grip strength of 5/5 bilaterally, though she also noted Graham's

right arm tremor.  R. 455.  Based on these observations, Dr. Revan opined that Graham had

"[m]ild limitations with the upper extremities for gross motor activity due to her carpal tunnel

syndrome of her right hand."  R. 456.  In an August 2016 evaluation, movement specialist Dr.

Howard Geyer noted that Graham's "[t]remor is constant but worsens at times unpredictably,"

and noted that "[i]t interferes with holding a glass, writing, [and] brushing teeth."  R. 458.  He

also noted that "[a]t times the right hand involuntarily clenches," and that it "feels weak."

R. 458.  He observed a "constant jerky fine tremor in the [right upper extremity] equally present

at rest and with action."  R. 462.  However, he also noted that a finger-nose-finger test "was

---

[9]  "Physiologic tremor occurs in all healthy individuals.  It is rarely visible to the eye and typically involves a fine shaking of both of the hands and also the fingers."  Tremor Fact Sheet. "Enhanced physiological tremor is a more noticeable case of physiologic tremor that can be easily seen.  It is generally not caused by a neurological disease but by reaction to certain drugs, alcohol withdrawal, or medical conditions including an overactive thyroid and hypoglycemia." Id.

performed slowly but without dysmetria." R. 462. In addition, he found that "[h]and grips, finger taps, and arm pronation/supination were performed essentially normally." R. 462. While these records confirm that Graham experiences a tremor in her right upper extremity, they also show normal grip strength and dexterity, which is inconsistent with the degree of limitation found by Dr. Browne. Accordingly, the ALJ could properly decline to give Dr. Browne's opinion controlling weight.

As for Dr. Revan, she opined that Graham has "no limitations with her speech, vision or hearing," "mild limitations with her upper extremities for gross motor activity due to carpal tunnel syndrome of her right hand," and "[m]ild to moderate limitation with sitting, climbing stairs, and standing due to her back pain." R. 456. In addition, Dr. Revan opined that Graham has "[l]imitations with walking due to shortness of breathing and lying down due to back pain," as well as "[m]ild to moderate limitation in personal grooming and activities of daily living secondary to shortness of breath and her allergies." R. 456. The ALJ rejected only the portions of Dr. Revan's opinion that "attribute[d] limitations to back pain," because the record did not document any medically determinable impairment that would explain Graham's back pain. See R. 22. In other words, the ALJ did not accept Dr. Revan's opinions regarding Graham's mild to moderate limitations with respect to sitting, climbing stairs, standing, and lying down, because Dr. Revan attributed these limitations Graham's back pain. See R. 22, 456. The ALJ could properly reject these opinions. Treating physician Dr. Browne had not found any significant limitations on sitting or standing. R. 467. And, Dr. Gitlevich routinely found Graham's "motor strength" to be normal. R. 420, 435, 441, 447, 483, 572, 651, 658.

Graham also argues that in declining to fully accept the opinion evidence of either Dr. Browne or Dr. Revan, who provided the only opinion evidence of record, the ALJ erred by

"creat[ing] a residual functional capacity for Graham based on his lay interpretation of the medical record," contrary to Selian v. Astrue, 708 F. 3d. 409 (2d Cir. 2013).  Pl. Mem. at 8-9.  In that case, the Second Circuit found that an ALJ erred where she misconstrued evidence in the record, by selectively quoting from medical notes and finding that two opinions were inconsistent with each other when they in fact appeared to be consistent.  Selian, 708 F.3d at 418-19.  In her brief, Graham quotes an explanatory parenthetical, in which the Selian court, 709 F.3d at 419, summarized Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998), as holding that an "ALJ may not 'arbitrarily substitute [her] own judgment for competent medical opinion'" Selian, 708 F.3d at 419 (quoting Balsamo, 142 F.3d at 81).  Here, the ALJ did not "arbitrarily" substitute his judgment for the opinions of either Dr. Browne or Dr. Revan.  As discussed above, the ALJ was entitled to give Dr. Browne's opinion limited weight because it was contradicted by substantial medical evidence in the record.  In addition, the ALJ rejected "the portions of Dr. Revan's opinion that attribute limitations to back pain," not for an arbitrary reason, but because "the record does not document any medically determinable impairment that would explain this symptom."  See R. 22.  This conclusion is supported by substantial evidence.  Although the ALJ acknowledged that Graham had reported a long history of lower back pain, R. 14, the only diagnostic studies in the record were lumbosacral x-rays, which were normal, see R. 462.  Dr. Revan's exam showed that Graham had lumbar spine flexion of 90 degrees and full lateral flexion and rotation.  R. 455.  Additionally, although Dr. Revan noted that Graham's straight leg raise was positive at 75 degrees bilaterally, it was negative in the seated position.  R. 455.  We are aware of no case law or other principle that requires that the record contain a statement by a medical professional that a claimant lacks restrictions before an ALJ may find that the restrictions asserted by a claimant are not supported by substantial evidence.  Accordingly, the

ALJ did not err in the application of the treating physician rule, or in declining to fully adopt a medical source opinion.

      B.  <u>Additional Evidence Submitted to the Appeals Council</u>

When Graham appealed her decision to the Appeals Council, she submitted additional evidence.  R. 249-50.  The Appeals Council found that the new evidence "does not show a reasonable probability that it would change the outcome of the decision."  R. 2.

Under Second Circuit law, "new evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision."  <u>Perez v. Chater</u>, 77 F.3d 41, 45 (2d Cir. 1996).  That review is governed by the limitations stated in 20 C.F.R. §§ 404.970(b) and 416.1470(b).  <u>Id.</u>  The regulations have been changed since <u>Perez</u> was decided and now provide that "[t]he Appeals Council will review a case if . . . the Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision," provided that the claimant can make a showing of "good cause" as defined in the regulation.  <u>See</u> 20 C.F.R. § 404.970(b); <u>accord</u> 20 C.F.R. § 416.1470(b).

42 U.S.C. § 405(g) provides in pertinent part that "[t]he court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding. . . ."  <u>Id.</u>  This means that the claimant must make a "three-part showing" in order to have the evidence considered.  <u>Lisa v. Sec'y of Health & Human Servs.</u>, 940 F.2d 40, 43 (2d Cir. 1991).  The claimant must show that the evidence is (1) "new"; (2) "material"; and that there is (3) "good cause" for it not having

been offered earlier.  See id.  More specifically, as the Second Circuit has explained:

> [A]n appellant must show that the proffered evidence is (1) "new" and not merely
> cumulative of what is already in the record, . . . and that it is (2) material, that is,
> both relevant to the claimant's condition during the time period for which benefits
> were denied and probative. . . .  The concept of materiality requires, in addition, a
> reasonable possibility that the new evidence would have influenced the Secretary
> to decide claimant's application differently. . . .  Finally, claimant must show (3)
> good cause for her failure to present the evidence earlier.

Id. (citations and internal quotation marks omitted) (bracket in original).

As noted, Lisa states that "[t]he concept of materiality requires," inter alia, "a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently."  Id.  This "reasonable possibility" concept has now been explicitly included in the revised regulation.  See 20 C.F.R. § 404.970(a)(5) (requiring a showing that "there is a reasonable probability that the additional evidence would change the outcome of the decision"); accord 20 C.F.R § 416.1470(a)(5).

Under Perez and later Second Circuit case law, "[i]f the Appeals Council denies review of a case, the ALJ's decision, and not the Appeals Council's, is the final agency decision. . . . [A court] review[s] the entire administrative record, which includes the new evidence, and determines[s], as in every case, whether there is substantial evidence to support the decision of the Secretary."  Lesterhuis v. Colvin, 805 F.3d 83, 87 (2d Cir. 2015) (internal quotation marks omitted) (citing Perez, 77 F.3d at 46).  Where the Appeals Council has denied review, the federal court's review "focuses on the ALJ's decision."  Id.  Additionally, "[i]f the Appeals Council fails to fulfill its obligations under § 404.970(b) [and § 416.1470(b)], the proper course for the reviewing court is to remand for reconsideration in light of the new evidence."  Wilbon v. Colvin, 2016 WL 5402702, at *5 (W.D.N.Y. Sept. 28, 2016) (citations and internal quotation marks omitted); accord Patterson v. Colvin, 24 F. Supp. 3d 356, 372 (S.D.N.Y. 2014).  We note

that this is not a case where the new evidence includes the opinion of a treating physician, which has sometimes been found to trigger a requirement that the Appeals Council itself address the effect of that opinion.  See, e.g., Garcia v. Commr. of Soc. Sec., 208 F. Supp. 3d 547, 552 (S.D.N.Y. 2016).[10]

We examine the two new pieces of evidence next.

1. Medications List

One piece of evidence submitted is an updated medication list from Centennial Women's Center, current as of January 24, 2017.  Pl. Mem. at 9-10; see R. 969-71.  Plaintiff points out in her brief that this list indicates that Graham has a body mass index ("BMI") of 30.09, which means she is obese.  Pl. Mem. at 10 (citing R. 971).

Although a BMI of 30.09 is not indicated elsewhere in the record, the new records contain no indications of limitations associated with plaintiff's weight.  Notably, Graham's BMI had been documented at high levels throughout the record that was before the ALJ.  In August 2016, it was measured at 28.79.  R. 461.  In October 2016, it was measured at between 27.1 and

---

[10]  Notwithstanding case law's assumption that the court is expected to determine if the new evidence results in the ALJ's decision not being supported by substantial evidence or otherwise runs afoul of the section 405(g), we note that some case law has remanded to require an explication of the new evidence.  As was noted in Mendez v. Commissioner of Social Security, 2019 WL 2482187 (W.D.N.Y. June 14, 2019) and as is true here,"[t]he Appeals Council's adverse ruling essentially amounts to a sentence: 'We find this evidence does not show a reasonable probability that it would change the outcome of the decision.'"  Id. at *4.  Also, as was true in Mendez, "[t]he Appeals Council's perfunctory statement declining to review this material essentially leaves the Court without any idea as to whether the Council's ruling was correct."  Id.  Mendez declined to conduct its own review of the new evidence based on the Appeals Council's lack of explanation and the volume of the new evidence.  Id. at *4-5.  Here, however, the volume of new evidence represents but a small percentage of the medical record and does not present any complex issues.  Thus, we do not believe that remand is appropriate for the reasons stated in Mendez and will instead conduct our own review of the record as contemplated by Perez and later cases.

28.81, R. 689, 694, 698, 704, 710, 800, 813, 818, 822, 829, 837, 876, 871, which put Graham towards the middle range of "overweight," see Body Mass Index Table, Nat'l Heart, Lung, & Blood Institute, https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmi_tbl.pdf (last visited Dec. 4, 2018) ("BMI Table").  At the end of October 2016, Graham's BMI was measured at 29.73, R. 895, and in November 2015, it was calculated to be 29.6, R. 844, 847, 851-52, which is on the cusp between overweight and obese, see BMI Table.  During the hearing, Graham reported that her height was five foot five and that she weighed 175 pounds, R. 52, which would give her a BMI somewhere between 29.00 and 30.00, see BMI Table.  In light of the absence of any indication that Graham's weight resulted in any functional limitations, we cannot say that the Appeals Council erred in determining that the new information would not have affected the ALJ's decision.

The medications listed in the Centennial medication list that Graham flagged in her briefing papers are similarly noted elsewhere in the record.  See, e.g., R. 264 (record from 2014 noting that shortness of breath improved with Albuterol); R. 420 (noting that Graham was prescribed Celebrex and Fioricet for headaches); R. 464 (noting that Klonopin was ordered at visit); R. 682 (noting that Voltaren gel was helping lower back pain); R. 730 (noting prescription of elastic wrist splint); R. 730-31 (prescription list from 2014 including Flonase, Flovent, Topamax, Artane, Voltaren, Xalerto, and other medications on the Centennial medication list).  Accordingly, the medication list constitutes "cumulative" evidence that was not required to be considered by the Appeals Council.  In addition, Graham has made no argument as to how this evidence is "material" to her claim.

2. Records of Social Worker Karen J. Smaltz

The other piece of new evidence is a letter dated February 2, 2017, from Karen J. Smaltz,

LCSW, of Montefiore, which states that Graham was diagnosed with "Major Depressive Disorder; Anxiety Disorder due to medical condition, as well as Panic Disorder with Agoraphobia," and states that she is being treated by psychiatrist Dr. Natalia Markova. See Pl. Mem. at 9; see also R. 967-68.[11] This letter was accompanied by 59 pages of mental health records from Montefiore, dated October 11, 2016, to May 15, 2017. R. 908-66.

The records consist of progress notes from psychiatrist Natalia Markova, R. 908-33, 940-60, and notes from an intake evaluation conducted by Ariella Rodriguez, LMSW, R. 934-39, 961-66. These records note that Graham suffers from "Major Depressive Disorder without psychotic features," see R. 910, 915, 920, 925, 931, 942, 947, and contain other references to "Major Depressive Disorder," see R. 908, 913, 918, 923, 928, 940, 945, 950, 952, 955, 958. Nonetheless, these same records reflect that Graham was prescribed medication for the condition and consistently denied suicidal ideation,[12] homicidal ideation, auditory and visual hallucinations, manic symptoms, poor appetite, or paranoid ideation. R. 908, 913, 918, 923, 928-29. Notes from December 7, 2016, indicate that Graham reported that her "mood and anxiety have markedly improved on [Z]oloft 50mg daily and with psychotherapy." R. 923.

The new records also note that Graham reports that she experiences panic symptoms in crowds. R. 908, 913, 918-19. Graham's anxiety disorder is well-documented in other medical records, also from Montefiore. See R. 447, 449, 457, 459, 463, 477, 487, 495, 512, 519, 583,

---

[11] The letter also lists Graham's physical diagnoses, which include deep vein thrombosis, embolus, migraines (unspecified, without mention of intractable migraine), vertigo, asthma, and carpal tunnel syndrome, and lists her surgical history. See R. 967-68.

[12] A note from October 31, 2016, states that Graham denied having a suicidal plan or intent, but stated that Graham said that "she is sick of dealing with her medical problems and sometimes feels it would be better if she weren't alive since she is not able to contribute anything to her family." R. 928-29.

653, 658, 659, 664, 666, 750, 761, 769, 773, 775, 872, 877.  In particular, on January 21, 2015,

Dr. Spivack noted, with respect to Graham, that "[t]here is a very heavy anxiety overlay here."

R. 877.  He also noted that while "[t]he trigger seems to have been [pulmonary

embolism], . . . the reaction to that has lingered and is now overwhelming."  R. 877.  Indeed, the

ALJ explicitly considered Graham's anxiety in his decision, and applied the "paragraph B"

criteria to determine that Graham's anxiety was nonsevere, R. 14-15 — a conclusion that

Graham has not challenged in this court, see Pl. Mem.  In other words, much of the material in

the newly presented records is not in fact "new."

Prior to the submission of the new documents, the record did not reflect that Graham's

anxiety is triggered by crowds.  Accordingly, this evidence, see R. 908, 913, 918, 940, 945, is

arguably "new."  The additional records also reflect that Graham has a diagnosis of "[p]anic

disorder with agoraphobia," R. 908, 913, 940, which was not previously reflected in the record.

Once again, we note that this is not a case where an opinion from a treating physician has

been presented, thereby triggering the Appeals Council's obligation to provide an explanation

for its rejection of the treating physician's opinion.  Graham herself makes no argument as to

why the ALJ's decision would have been different, or is not supported by substantial evidence, if

the new records are included.  The mental status examinations in the previous record consistently

showed that Graham was alert and oriented, had a normal affect, and demonstrated intact

memory, language, and executive functions.  See R. 377, 383, 387, 670, 675-76, 682, 689, 694,

704, 710, 729, 739.  In her initial application for benefits, she denied having any problems

getting along with family, friends, neighbors, or others.  R. 218.  In addition, Graham's

discharge summary from Montefiore in January 2014 indicates that she had a "normal affect"

and "responds appropriately to questions."  R. 270.

As for her agoraphobia and panic attacks, the ALJ noted that while Graham "sometimes experienced asthma attacks triggered by anxiety . . . she could slow her breathing down on her own and did not usually require medical intervention for these attacks." R. 14. The ALJ also noted that Graham did not report "any problems driving, managing money, or performing routine household chores" because of her anxiety symptoms. R. 14-15. Graham herself noted in her application for benefits that she can go out alone, and uses public transportation. R. 216. While the supplemental records note that Graham's anxiety sometimes prevented her from taking public transportation, R. 918, 945, such a finding would be unlikely to influence the ALJ's decision, where Graham testified that though she "do[esn't] like trains," she traveled to the hearing by train, R. 53, and that she primarily travels to her medical appointments by car, with either herself or her husband driving, see R. 64.

More importantly, the new records do not reflect limitations with the possible exception that it might be inferred Graham should not be exposed to crowds. Given that none of the jobs proposed for Graham — babysitter, hand packager, cashier, and office helper, R. 24-25 — apparently involve exposure to crowds, we cannot find that the Appeals Council erred in finding that the new information was unlikely to have affected the ALJ's decision. Indeed, Graham herself makes no such argument.

IV.  CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Docket # 22) is granted, and Graham's motion for judgment on the pleadings (Docket # 14) is denied. The Clerk is requested to enter judgment.

Dated: September 19, 2019
      New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge